UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-60701-CIV-ZLOCH

MY. P.I.I., LLC,

    Plaintiff,

vs.                                             **O R D E R**

TOGNUM AMERICA, INC., et al.,

    Defendants.
_____/

THIS MATTER is before the Court upon Defendants' Motion For Final Summary Judgment And Incorporated Memorandum Of Law (DE 105). The Court has carefully reviewed said Motion and the entire court file, and with the benefit of oral argument is otherwise fully advised in the premises.

## I. Background

This action arises out of Plaintiff's purchase of a 115-foot motor yacht. Plaintiff initiated the above-styled cause with the filing of its Complaint (DE 1) related to Plaintiff's pre-purchase survey of the yacht and coverage under a warranty issued on the yacht's engines. Plaintiff's Complaint (DE 1) asserts six counts: (I) breach of contract under Florida law; (II) breach of express warranty under Florida law; (III) breach of express warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq.; (IV) breach of implied warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et. seq.; (V) breach of oral contract under Florida law; and (VI) misrepresentation under Florida law.

The following facts, unless otherwise noted, are undisputed.[1] In 2007, Defendant MTU Friedrichshafen ("MTU FN") manufactured two marine diesel engines, which were fitted onto a 115-foot Baglietto motor yacht (the "Yacht") in 2008. The Yacht was initially displayed at a boat show in Europe, but was then repossessed and lifted out of water and stored in a garage from some time in 2008 until October 2011.

In early 2012, James Leonardo, Plaintiff's sole member, became interested in purchasing a large yacht. To that end, he utilized a broker in the United Kingdom, Repossessed Motor Yachts, to find a suitable vessel. Through his broker, Leonardo became interested in purchasing the Yacht. The broker contacted Defendant MTU FN, requesting information on the availability of and procedures for obtaining a warranty on the Yacht's engines. Defendant MTU FN advised that the engines were eligible for warranty coverage, contingent on the Yacht passing an inspection and sea trial.

One of Defendant MTU FN's related companies, MTU Italia, conducted a sea trial of the Yacht and collected information regarding the engines' performance. No performance issues were noted by MTU Italia and the engines passed the sea trial. However, the Parties do not agree whether, and if so to what extent, the engines' coolant was analyzed during the sea trial.

---

[1] The following facts are taken from Defendants' Statement Of Material Facts In Support Of Their Motion For Final Summary Judgment (DE 104) accompanying Defendants' Motion For Final Summary Judgment (DE 105) and Plaintiff's Response To Defendants' Statement Of Material Facts In Support Of The Joint Motion For Summary Judgment (DE 113).

2

Plaintiff's vessel surveyor was present with MTU Italia representatives during the sea trial. Plaintiff's surveyor pointed out to MTU Italia's technician that there was a residue on the engines from an apparent coolant leakage. According to Plaintiff, the MTU Italia technician stated that the leaks were a normal occurrence and that there was nothing about which to be alarmed.

Thereafter, Plaintiff proceeded with its purchase of the Yacht, buying it from an Italian financial institution. The sale closed in the waters off the coast of Italy on July 30, 2012. Defendant MTU FN agreed to issue a warranty on the engines, effective as of the date of the closing. According to Plaintiff, a physical copy of the warranty was not delivered until some point after the closing. The Yacht was then transported to Florida in October of 2012.

After its arrival in Florida, Plaintiff had samples of the Yacht's fluids taken; the engine coolant samples indicated an abnormality. Although the engines' coolant was later changed, an inspection in August of 2013 revealed that the engines suffered from "silicate dropout," a condition related to engine coolant. As a result of "silicate dropout," some internal parts of the engine became plated with silicate.

In October of 2014, a sea trial of the Yacht was conducted to determine whether it was eligible for extended warranty coverage. The engines performed well and passed the sea trial. Coolant samples were taken from the engines, at which time there were no

3

issues indicated. However, the Parties—and their experts—disagree as to whether the engines are in fact damaged as a result of the "silicate dropout." Defendants' expert believes that the engines are operating normally and that there is not enough information to determine whether the silicate dropout condition will affect the engines' life span. Plaintiff's expert believes that the engines are damaged and that the condition will likely shorten the life of the engines and may result in catastrophic engine failure. The Parties vigorously dispute whether the condition in the engines constitutes a defect and whether the condition is covered by warranty. Defendants have filed the instant Motion (DE 105), arguing that the above-styled cause should be resolved as a matter of law in their favor.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th Cir. 1990). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v.

4

Catrett, 477 U.S. 317, 323 (1986)(quotation omitted). Indeed,

> [t]he moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.

Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991); Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). The moving party is entitled to "judgment as a matter of law" when the non-moving party fails to make a sufficient showing of an essential element of the case to which the non-moving party has the burden of proof. Celotex Corp., 477 U.S. at 322; Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987). Further, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

### III. Analysis

By the instant Motion (DE 105), Defendants assert that there are no genuine issues of material fact and that each Count of the Complaint (DE 1) fails as a matter of law. For the reasons that follow, the Court will grant in part, and deny in part, Defendants' Motion (DE 105).

#### A. Magnuson-Moss Warranty Act Claims

Defendants contend that they are entitled to summary judgment as to Plaintiff's claims under the Magnuson-Moss Warranty Act (hereinafter "Magnuson-Moss" or "the Act"), 15 U.S.C. § 2301, et

5

seq., Counts III and IV, arguing that Magnuson-Moss does not have extraterritorial application.

Defendants claim first that Magnuson-Moss does not contain any explicit indication that it is to be applied extraterritorially. Defendants further assert that Plaintiff obtained the vessel in a purely foreign transaction; therefore, Plaintiff's claims under Magnuson-Moss fail as a matter of law. Plaintiff responds by arguing that because the vessel was purchased by an American consumer with the intent of having it imported into the United States, the transaction has domestic components and Magnuson-Moss applies. The Court is thus presented with the question of whether Magnuson-Moss applies to the sale of a foreign manufacturer's goods in a foreign country when the buyer intends later to bring the goods back to the United States. Consistent with the presumption against extraterritoriality, the Court finds that the Act does not.

1. The Presumption Against Extraterritoriality

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." E.E.O.C. v. Arabian America Oil Company, 449 U.S. 244, 248 (1991)(internal quotations omitted)(hereinafter "Aramco"). "This principle represents a canon of statutory construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate." Morrison v. Nat'l Austl. Bank, Ltd., 561 U.S. 247, 255 (2010).

6

This presumption against extraterritoriality "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." Id. It "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." Kiobel v. Royal Dutch Petroleum Co., 133 S.Ct. 1659, 1664 (2013)(citations omitted). The presumption against extraterritoriality is also buttressed by the understanding that Congress—unlike a court—has the "facilities necessary to make fairly such an important policy decision [to apply a U.S. law abroad] where the possibilities of international discord are so evident and retaliative action so certain." Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 147 (1957). Thus, the Supreme Court has mandated that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." Morrison, 561 U.S. at 255.

Magnuson-Moss sets certain standards for written warranties on consumer products. The Act authorizes a civil suit by a consumer who is damaged by either a warrantor's failure to comply with the Act or to perform under a written or implied warranty. 15 U.S.C. § 2310(d)(1) (2015). However, Magnuson-Moss's application is limited to consumer products that are "distributed in commerce." § 2301(1). Under the Act, "distributed in commerce" means "sold into commerce, introduced or delivered for introduction into commerce, or held for sale or distribution after introduction into commerce." § 2301(13). In defining "commerce," Congress utilized

7

a boilerplate definition of that term—"'commerce' means trade, traffic, commerce, or transportation (A) between a place in a State and any place outside thereof, or (B) which affects trade, traffic, commerce, or transportation described in subparagraph (A)." § 2301(14).

These definitions are the only provisions of the statute upon which Plaintiff relies to explain why Magnuson-Moss applies outside the territorial bounds of the United States. Plaintiff's argument is unpersuasive. In Aramco and Morrison, the Supreme Court considered strikingly similar definitions of the term "commerce" in Title VII of the Civil Rights Act and the Securities Exchange Act, respectively, to determine whether those statutes had extraterritorial application. Compare § 2301(14)("'commerce' means trade, traffic, commerce, or transportation (A) between a place in a State and any place outside thereof. . ."), with 42 U.S.C. § 2000e(g)("'commerce' means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof. . .") and 15 U.S.C. § 78c(a)(17)("'interstate commerce' means trade, commerce, transportation, or communication among the several states, or between any foreign country and any State, or between any State and any place or ship outside thereof."). The Supreme Court found that neither the definition of "commerce" in Title VII nor in the Exchange Act was sufficient to defeat the presumption against extraterritoriality. See Morrison, 561 U.S. at 262–63;

8

Aramco, 499 U.S. at 249–53.  Indeed, "even statutes that contain broad language in their definitions of 'commerce' that expressly refer to 'foreign commerce' do not apply abroad." Id. at 251.  The Supreme Court prudently observed that

> [m]any Acts of Congress are based on the authority of that body to regulate commerce among the several states, and the parts of these acts setting forth the legislative jurisdiction will obviously refer to such commerce in one way or another. If we were to permit possible, or even permissible, interpretations of language such as that involved here to override the presumption against extraterritorial application, there would be little left of the presumption.

Id. at 253.  Thus, as with Title VII and the Exchange Act, Magnusons-Moss's definition of "commerce" is not sufficient to rebut the presumption against extraterritoriality.

The remainder of Magnuson-Moss is silent as to extraterritoriality: no other portion of the statute explicitly—or for that matter, impliedly or contextually—expresses an intention that the statute apply abroad. See also Stein v. Marquis Yachts, LLC, No. 14-24756, 2015 WL 3440163 (S.D. Fla. 2015)(finding that Magnuson-Moss does not apply extraterritorially); In re Toyota Motor Corp., 785 F. Supp. 2d 883, 914 (C.D. Cal. 2011)("The parties agree that [Magnuson-Moss] does not contain explicit language regarding its extraterritorial application, and the Court concludes that [Magnuson-Moss] does not apply extraterritorially."). Rather, the plain language of the statute suggests that it only applies within the United States.

As explained above, Magnuson-Moss makes actionable a warrantor's failure to "comply with any obligation under this chapter or under a written warranty, implied warranty, or service contract. . . ." 15 U.S.C. § 2310(d)(1). These obligations are created only by virtue of domestic law—federal and state—not by foreign law. Obligations under Magnuson-Moss ("this chapter") are obviously created by federal law. As for the obligations under written and implied warranties, courts have uniformly held that it is state[2] law that creates and governs those obligations. See e.g. Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1022 (9th Cir. 2008) ("claims under the Magnuson-Moss Act stand or fall with [] express and implied warranty claims under state law."); Walsh v. Ford Motor Co., 807 F.2d 1000, 1015 (D.C. Cir. 1986) ("state warranty law lies at the base of all warranty claims under Magnuson-Moss"); MacKenzie v. Chrysler Corp., 607 F.2d 1162, 1166 (5th Cir. 1979)[3] (concluding that the proper jury instruction for a warranty claim under Magnuson-Moss is the relevant jury instruction for breach of warranty under state law). Magnuson-Moss makes no mention of warranty obligations arising under foreign law. This omission is telling—particularly when juxtaposed against the statute's explicit mention of state and federal law. See e.g. §

---

[2] Under the statute, "'State' means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Canal Zone, or American Samoa." § 2301(15).

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1980.

10

2301(15)("The term 'State law' includes a law of the United States applicable only to the District of Columbia or only a territory or possession of the United States; and the term 'Federal law' excludes any State law."); cf. Aramco, 499 U.S. at 256 (refusing to apply Title VII overseas, and noting that although "Title VII consistently speaks in terms of 'States' and state proceedings, it fails even to mention foreign nations or foreign proceedings.").

Similarly, the statute is silent as to conflicts with foreign law—though it does contain a preemption provision regarding conflicts with state law. See § 2311. Were the statute to regulate abroad, Congress undoubtedly "would have addressed the subject of conflicts with foreign laws and procedures." Aramco, 499 U.S. at 256. Absent a clear indication that Congress intended Magnuson-Moss to apply extraterritorially, the Court concludes that it does not.

### 2. The "Focus" of the Magnuson-Moss Warranty Act

Plaintiff attempts to circumvent the presumption against extraterritoriality by arguing that Plaintiff's purchase of the vessel is sufficiently connected with the United States to justify application of Magnuson-Moss. Specifically, Plaintiff argues that Magnuson-Moss applies because Plaintiff is an American consumer, Defendant knew Plaintiff intended to bring the vessel back to the United States, Plaintiff received its copy of the written engine warranty in the United States, and Defendants have utilized a warranty servicer in the United States. However, the domestic

11

contacts asserted by Plaintiff are immaterial to its claims under Magunson-Moss.

In <u>Morrison</u>, the Supreme Court observed that "it is a rare case of prohibited extraterritorial application that lacks <u>all</u> contact with the territory of the United States." <u>Morrison</u>, 561 U.S. at 266 (emphasis supplied). Consequently, in cases involving both territorial and extraterritorial conduct, the Supreme Court has looked to the "focus" of the statute in analyzing extraterritoriality. <u>See</u> <u>e.g.</u>, <u>id.</u> at 266–70; <u>Aramco</u>, 499 U.S. at 255. If the conduct that constitutes the "focus" of the statute occurred abroad, then the presumption against extraterritoriality applies and the statute in question governs only if that presumption has been rebutted.[4] <u>Morrison</u>, 566 U.S. at 266–70; <u>cf.</u> <u>Environmental Defense Fund, Inc. v. Massey</u>, 986 F.2d 528, 532 (D.C. Cir. 1993)(noting that when considering the presumption against extraterritoriality, courts should consider "whether the statute seeks to regulate conduct in the United States or in another sovereign country.").

In <u>Morrison</u>, the Supreme Court deduced the "focus" of § 10(b) of the Securities Exchange Act from the statute's plain text and the context of its overall legislative scheme. 499 U.S. at 266–69. The Court held that for purposes of § 10(b) securities fraud actions, "the focus of the Exchange Act is not upon the place where

---

[4] Conversely, if the conduct that constitutes the "focus" of the statute occurred domestically, there is no extraterritoriality problem.

12

the deception originated, but upon purchases and sales of securities in the United States." Id. at 266.

Applying the same "focus" analysis here, the Court concludes that the focus of Magnuson-Moss is upon consumer transactions—that is, the sale of a consumer product to a consumer. The plain language of Magnuson-Moss compels this conclusion.

Section 2302(a) of Magnuson-Moss states that one of the statute's purposes is to "improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products. . . ." 15 U.S.C. § 2302(a). Each of these ends is aimed at the sale of the product. Adequate information is useful for the consumer to make an informed purchase; deception only consummates upon the sale of the product; marketing is a mechanism of inducing sales.

Moreover, in defining the primary object of the statute's regulatory scope—written warranties—Congress made clear that the sale is the critical event triggering application of the statute. A written warranty is a "written affirmation of fact or written promise <u>made in connection with the sale of a consumer product</u>. . . ." § 2301(6)(A) (emphasis added). For purposes of Magnuson-Moss, a written warranty is also "any undertaking in writing <u>in connection with the sale by a supplier of a consumer product</u> to refund, repair, replace or take other remedial action. . . ." § 2301(6)(B) (emphasis added). Of course, such a warranty would be quite meaningless if the product had never actually been sold to a

13

consumer. But in case that conclusion was not self-evident from the nature of a warranty, Magnuson-Moss requires that the written warranty "become[] part of the basis of the bargain between a supplier and a buyer. . . ." § 2301(6).

Magnuson-Moss's focus on sales of consumer products is likewise confirmed by the statute's definition of implied warranty, as well as the nature of an implied warranty. "The term 'implied warranty' means an implied warranty arising under State law. . . <u>in connection with the sale</u> by a supplier of a consumer product." § 2301(7) (emphasis added). Generally, under State law, "a warranty that the goods shall be merchantable is <u>implied in a contract for their sale</u> if the seller is a merchant with respect to goods of that kind." UCC § 2-314(1) (Am. Law Inst. & Unif. Law. Comm'n 2012)(emphasis added). Or, "[w]here the seller <u>at the time of contracting [for sale of the goods]</u> has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is. . . an implied warranty that the goods shall be fit for such purpose." UCC § 2-315 (Am. Law Inst. & Unif. Law. Comm'n 2012)(emphasis added). As with a written warranty, an implied warranty only arises upon the sale of the product.

Beyond these definitions, Magnuson-Moss repeatedly references the sale of a product in its regulatory scheme, further substantiating the statute's focus on consumer transactions. E.g.,

14

15 U.S.C. § 2302(b)(1)(A) ("The Commission shall prescribe rules requiring that the terms of any written warranty on a consumer product be made available to the consumer (or prospective consumer) <u>prior to the sale of the product to him</u>."); § 2305 ("Nothing in this chapter shall prohibit <u>the selling</u> of a consumer product which has both full and limited warranties. . . ."); § 2309(b) (directing the Commission to institute rule-making proceedings for "warranties and warranty practices <u>in connection with the sale</u> of used motor vehicles. . .").

The context of Magnuson-Moss's legislative scheme also confirms that the statute's focus is the sale to the consumer. Magnuson-Moss does not require a seller to offer any specific warranty on its products. Rather, Magnuson-Moss requires warrantors to "fully and conspicuously disclose in simple and readily understood language the terms of [its] warranty." § 2302(a). Moreover, the statute allows warrantors to designate their warranties as either "full" or "limited." § 2303(a). Only warranties meeting Magnuson-Moss's minimum standards may be designated as "full," § 2303(a)(1), giving consumers the ability to discern between warranties offering comprehensive coverage and those not. Thus, in concert, "Magnuson-Moss takes a free market approach to increasing warranty protections afforded consumers," relying "on the forces of competition, nourished by the increased information, to spur sellers to enhance warranty terms." Dee Pridgen & Richard M. Alderman, <u>Consumer Protection and the Law</u> §

15

14:2 (2015). It is the sale to consumers that fuels Magnuson-Moss's protections. Accordingly, the Court finds that the focus of Magnuson-Moss is the sale of the consumer product to the consumer.[5]

All Parties agree that the sale of the yacht occurred in the waters off the coast of Italy. Thus, the conduct that is the focus of Magnuson-Moss occurred outside the United States and the presumption against extraterritoriality applies. For the reasons set forth above, the Court finds that said presumption has not been rebutted. As a result, Magnuson-Moss is inapplicable to the transaction that gave rise to this matter. The Court will therefore grant Defendant's Motion For Final Summary Judgment (DE 105) as to Counts III and IV.

B. <u>Breach of Oral Contract and Covenant of Good Faith and Fair Dealing Claims</u>

Defendants next argue that they are entitled to summary judgment on Count V, which asserts claims for breach of oral contract and the covenant of good faith and fair dealing, relying on Florida's Statute of Frauds.[6]

---

[5] Because the sale of the consumer product is the operative event for purposes of Magnuson-Moss, the citizenship of the purchaser, the intended destination of the product, and the place where the purchaser received a written copy of the warranty are not material (as Plaintiff suggests). The place where the warranty is ultimately serviced is also not material, as Magnuson-Moss contemplates that a manufacturer may utilize an agent to service its warranty. See § 2307 (allowing the warrantor to designate a representative to perform its duties under the warranty). Thus, a foreign manufacturer may have its warranty serviced in the United States through an agent, without the need to have the goods returned abroad for servicing.

[6] On January 15, 2016, the Court held oral argument on the instant Motion (DE 105). At that argument, both Parties agreed that Florida law governs the claim set forth in Count V of the Complaint (DE 1).

16

Florida's Statute of Frauds provides in relevant part that

> [n]o action shall be brought. . . upon any agreement that is not to be performed within the space of 1 year from the making thereof. . . unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith. . . .

Fla. Stat. § 725.01. "The general rule is that an oral contract for an indefinite time is not barred by the Statute of Frauds. Only if a contract could not possibly be performed within one year would it fall within the statute." Acoustic Innovations, Inc. v. Schafer, 976 So. 2d 1139 (Fla. Dist. Ct. App. 2008).

Count V asserts that an oral contract existed between Plaintiff and Defendants, which was breached when Defendants "denied warranty repairs premised upon the pre-warranty condition of the engines, coolant and oil." DE 1, ¶ 125. By implication, it is apparent that one of Defendants' duties under the oral contract alleged by Plaintiff was to make repairs when Plaintiff asserted a claim under the warranty. Yet the warranty had a 24-month term. Thus, Defendants' performance under the oral contract could not be completed until the warranty lapsed—well over a year after the contract was made. The oral contract alleged by Plaintiff in Count V falls squarely within Florida's Statute of Frauds.

Plaintiff argues that its claim is not barred by the Statute of Frauds because it fully performed under the contract. Florida law recognizes the doctrine of part performance, whereby "full performance by one party to the contract works to remove an oral

17

agreement from the purview of the Statute of Frauds." <u>101 Monument Road, Inc. v. Delta Prop. Mgmt., Inc.</u>, 993 So. 2d 181, 182 (Fla. Dist. Ct. App. 2008). However, "[t]he doctrine of part performance to excuse a failure to comply with the Statute of Frauds is not available in Florida to actions solely for money damages." <u>Wharfside at Boca Pointe, Inc. v. Superior Bank</u>, 741 So. 2d 542, 545 (Fla. Dist. Ct. App. 1999); <u>see</u> <u>also</u> <u>Ala v. Chesser</u>, 5 So. 2d 715, 719 (Fla. Dist. Ct. App. 2009) (noting that part performance only excuses non-compliance with the Statute of Frauds in actions seeking equitable relief).

Here, Plaintiff seeks only money damages by Count V.  <u>See</u> DE 1. Thus, part performance does not excuse non-compliance with the Statute of Frauds. Because the contract asserted by Plaintiff in Count V is neither in writing nor signed by Defendants, Plaintiff's claim under that contract is in fact barred by the Statute of Frauds. Further, because the contract that serves as the predicate to Plaintiff's breach of good faith and fair dealing claim is unenforceable, that claim likewise fails as a matter of law. <u>See</u> <u>Insurance Concepts and Design, Inc. v. Healthplan Servs., Inc.</u>, 785 So. 2d 1232, 1234–35 (Fla. Dist. Ct. App. 2001) (noting that a claim for breach of good faith and fair dealing cannot be maintained under Florida law unless there is an enforceable contract term that the defendant was obligated to perform); <u>see</u> <u>also</u> <u>Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.</u>, 162 F.2d 1290, 1314 (11th Cir. 1998). The Court will grant the instant

Motion (DE 105) as to Count V.

C. <u>The Remaining Counts</u>

As to the remaining Counts (I, II, & VI), the Court notes, after a careful review of the entire court record herein, that genuine issues of fact remain to be tried. For example, in the instant Motion (DE 105), Defendants argue that because the Yacht's engines are currently operating, they are not damaged or defective, thereby reprieving them of liability. This point is hotly contested. Plaintiff's expert suggests that the engines are in fact damaged, and the life span of the engines will be truncated as a result. Whether the engines are damaged or defective is a material issue that remains to be tried. Reference by the Court to the aforementioned example should not be construed to limit a subsequent trial to that issue alone.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** that Defendants' Motion For Final Summary Judgment And Incorporated Memorandum Of Law (DE 105) be and the same is hereby **GRANTED** in part and **DENIED** in part as follows:

1. To the extent that Defendants seek judgment as a matter of law in their favor as to Counts III, IV, and V, Defendants' Motion For Final Summary Judgment And Incorporated Memorandum Of Law (DE 105) be and the same is hereby **GRANTED**; and

2. To the extent that Defendants seek judgment as a matter of law in their favor as to Counts I, II, and VI, Defendants' Motion

For Final Summary Judgment And Incorporated Memorandum Of Law (DE 105) be and the same is hereby **DENIED**; and

    3. Final Judgment as to Counts III, IV, and V will be entered by separate Order.

    **DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 31st day of March, 2016.

/s/ William J. Zloch
WILLIAM J. ZLOCH
United States District Judge

Copies furnished:

All Counsel of Record